# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## MISSOULA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE FORENSIC DIGITAL EXAMINATION OF THE CELLULAR TELEPHONE(S) AND ELECTRONIC DEVICE UTILIZED BY TONY ORTIZ AND VERONICA YANKA CURRENTLY LOCATED IN MISSOULA, MONTANA. | Case No. _____ |

## AFFIDAVIT IN SUPPORT

## OF AN APPLICATION FOR A SEARCH WARRANT

I, Kevin Evans, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

a.   This Affidavit is made in support of a search warrant for evidence, fruits, and instrumentalities of (a) conspiracy to possess with intent to distribute methamphetamine and possession with intent to distribute over 500 grams of methamphetamine, in violation of 21 U.S.C §§ 846 and 841(a)(1), as those items are set forth in Attachment B, of

the following electronic devices, which are further described in Attachment A-1, A-2, A-3 and A-4, and are hereafter referred to as the "SUBJECT ELECTRONIC DEVICES."

a.  One black Motorola cell phone with white cloud like sticker on the back, type M373B, Sprint Service, SIM card number: 89011203000071437566, cellular number: 916-891-8379, utilized by Tony ORTIZ. This cellular telephone is further described as Exhibit N-2 in DEA case file RM-19-0088, hereinafter referred to as (EXHIBIT N-2). On 07-25-2019, your affiant seized EXHIBIT N-2 from the center console of the rental vehicle in which Tony ORTIZ was a passenger. A prior search of the vehicle yielded approximately 2 pounds of methamphetamine concealed inside chip bags. See Attachment A-1.

b.  One i-phone with a glittery case, T-Mobile service provider, SIM card number: 89012609117967621114108648, cellular number: 415-299-9660, utilized by Veronica YANKA. This cellular telephone is further described as Exhibit N-3 in DEA case file RM-19-0088, hereinafter referred to as (EXHIBIT N-3). On 07-25-2019, your affiant seized EXHIBIT N-3 from the driver's door

2

pocket of the rental vehicle in which Veronica YANKA was the driver. A prior search of the vehicle yielded approximately 2 pounds of methamphetamine concealed inside chip bags. See Attachment A-2.

c. One Samsung tablet with silver colored back, serial number: R52M104AJFV. Veronica YANKA admitted post Miranda this device belonged to her and was utilized for "work" purposes. It is currently unknown if this device is capable of receiving cellular calls. This electronic device is further described as Exhibit N-4 in DEA case file RM-19-0088, hereinafter referred to as (EXHIBIT N-4). On 07-25-2019, your affiant seized EXHIBIT N-4 from inside a black bag on the backseat of the rental vehicle in which Veronica YANKA was the driver. A prior search of the vehicle yielded approximately 2 pounds of methamphetamine concealed inside chip bags. See Attachment A-3

d. One black LG cell phone, T-Mobile service provider, IMEI number: 359584090893009, SIM card number: 8901260072942768792F, cellular number currently unknown. Veronica YANKA admitted post Miranda this device belonged to her and was utilized for

"work" purposes. This electronic device is further described as Exhibit N-5 in DEA case file RM-19-0088, hereinafter referred to as (EXHIBIT N-5). On 07-25-2019, your affiant seized EXHIBIT N-5 from inside a black bag on the backseat of the rental vehicle in which Veronica YANKA was the driver. A prior search of the vehicle yielded approximately 2 pounds of methamphetamine concealed inside chip bags. See Attachment A-4.

e. The SUBJECT ELECTRONIC DEVICES are currently in DEA custody in Missoula, Montana.

b.     The affiant has probable cause to believe the SUBJECT ELECTRONIC DEVICES are currently being used to transport and distribute controlled substances, namely, but not limited to, methamphetamine. As previously stated, the SUBJECT ELECTRONIC DEVICES were seized from inside the rental car in which Veronica YANKA was identified as the driver and Tony ORTIZ was identified as the passenger. A search of the vehicle yielded approximately 2 pounds of methamphetamine. Following arrest, ORTIZ admitted post Miranda the drugs belonged to him. Prior to the search, a DEA investigation revealed members of the drug distribution conspiracy directed the

purported drug recipient/buyer's agent in Missoula (actually a DEA Source of Information) to contact the occupants of the load car (subsequently identified as ORTIZ and YANKA) by calling cellular numbers associated with EXHIBIT N-2 and EXHIBIT N-3. Since EXHIBIT N-4 and EXHIBIT N-5 were also seized from inside the rental car (load car), your affiant believes these electronic devices may also have been used to further the drug distribution conspiracy and contain digital forensic evidence related to the crime.

    c.    A criminal history query revealed in 2018, ORTIZ was convicted of felony manufacture of a controlled substance and felony causing fire of inhabited structure/property. In 2010, YANKA was convicted of misdemeanor petty theft.

    d.    I am a Special Agent with the United States Drug Enforcement Administration (DEA), duly appointed according to the law and acting as such. In 2002, I entered the DEA Basic Agent Training Academy in Quantico, Virginia. I am currently assigned to the Missoula, Montana Office. As a DEA Special Agent, I have participated in numerous complex investigations. I am familiar with and have participated in all of the normal methods of investigation, including, but

not limited to: visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of undercover agents, the use of Grand Jury, and the use of court authorized wire and electronic intercepts. I have conducted or assisted with investigations relative to the manufacture, smuggling, and distribution of controlled substances. Additionally, I have consulted with other agents who have been involved in similar investigations. As a result of my training and experience, I can recognize controlled substances, as well as paraphernalia used for ingesting, distributing, manufacturing, and storing controlled substances. I can also recognize conduct commonly engaged in by drug traffickers. I am familiar with all aspects of this investigation.

e. The purpose of applying for this warrant is to seize evidence, more particularly described in Attachment B, of violations of 21 U.S.C. §§ 841 and 846, that is, possession with intent to distribute and/or distribution of over 500 grams of methamphetamine, conspiracy to possess with the intent to distribute methamphetamine.

f. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846

have been committed by ORTIZ, YANKA and other co-conspirators.
There is also probable cause to believe the information described in
Attachment B will constitute evidence of these criminal violations, and
will lead to the identification of individuals who are engaged in the
commission of these offenses and/or other locations wherein additional
evidence may be uncovered.

## INITIATION OF INVESTIGATION

g.      The facts and information contained in this affidavit are
based upon my training and experience, participation in this drug
investigation, personal knowledge, and observations during the course
of this investigation, as well as the observations of other agents/officers
involved in this investigation and other investigations which involved
the same individuals.  All observations not personally made by me were
relayed to me by the individuals who made them or were conveyed to
me by my review of records, documents, and other physical evidence
obtained during the course of this investigation.  This affidavit contains
information necessary to support a determination of probable cause and
is not intended to include each and every fact and matter observed by
me or known to the government.

7

h.     On July 14, 2019, your affiant received information from a

DEA Source of Information (hereinafter referred to as SOI) indicating a

known multi-pound drug distributor currently the target of another

DEA investigation (hereinafter referred to as TARGET) was in the

process of sending approximately two (2) pounds of methamphetamine

from the area of Sacramento, California to Missoula, Montana for

purposes of distribution.

i.     According to the SOI, multiple weeks beforehand TARGET

solicited the SOI's assistance in locating a methamphetamine buyer in

Missoula. Over the course of continued negotiations, the SOI acted as a

broker/middleman for a prospective buyer in Missoula for two (2)

pounds of methamphetamine to be supplied by TARGET on or about

July 15, 2019. The SOI did not believe TARGET was planning to

deliver the methamphetamine himself. Rather, TARGET utilized

another individual known by the moniker "GHOST" (FNU LNU) to

arrange the courier/driver (subsequently identified as ORTIZ) and

transport vehicle (rental car bearing CA plate 8EHY700) to

deliver/transport the methamphetamine to Missoula.

j.      On July 15, 2019 (while the load car was still in route to Missoula), the SOI asked TARGET for a phone number to contact the occupants of the load car so arrangements could be made regarding where/when to meet, etc. (to consummate the proposed transaction). In response, TARGET sent the SOI a message, "My dude (suspected to be GHOST) sent his brother-in-law (believed to be ORTIZ as courier) so I just been communicating with my gut (sic) and he been giving me updates...His name is Robert (suspected alias name), 916-891-8379 (EXHIBIT N-2). [This is the same cellular telephone number given by Tony ORTIZ following a traffic stop later in the day]. The SOI attempted to call this number but it was not answered.

k.      Afterward, the SOI sent a message to TARGET complaining "Robert" would not answer and asked if it was the correct number? In response, TARGET sent a return message indicating his guy "GHOST" gave him the number and repeated the load car was in Idaho 4 hours ago and should be arriving in Missoula in a short time.

l.      After additional time, TARGET sent a message to the SOI requesting he/she call another number in an effort to contact the occupants of the load car, 415-299-9660 (EXHIBIT N-3). [This is the

9

same cellular telephone number given by Veronica YANKA following a traffic stop later in the day]. The SOI attempted to call this number but it was similarly not answered.

m.    A short time later, TARGET sent the SOI a screen shot of communication between himself (TARGET) and GHOST wherein TARGET said the SOI was unable to contact "them" (at that time it was unknown to law enforcement if the occupant of the load car had 2 cellular telephones or if there were 2 or more occupants each having a phone). GHOST replied, "They have no reception. But on snap chat it shows there location. They still on the road." TARGET asked, "How much longer". GHOST wrote, "There almost in montana...Bro jus tell (pronoun referencing the SOI) they coming...jus have the dude ready with money..". Due to this message regarding snap chat, your affiant believes the members of the drug conspiracy were utilizing multiple means (based on cellular and/or internet signals) to communicate via SUBJECT ELECTRONIC DEVICES.

n.    At approximately 6:19 p.m., your affiant overheard a conversation between the SOI and ORTIZ (who utilized EXHIBIT N-2) via a 3-way call. ORTIZ said he arrived in Missoula and was currently

at a local restaurant. Surveillance agents went to the restaurant and spotted a rental vehicle in the parking lot. A male and female (subsequently identified as ORTIZ and YANKA) exited the restaurant and got into the rental car. A short time later, the rental vehicle drove across the street and entered a gas station. While ORTIZ was standing outside the vehicle, the SOI placed another call to ORTIZ as your affiant listened via 3-way calling. At that time, your affiant was able to determine ORTIZ was the party speaking with the SOI. The subject matter of this call regarded details of the proposed transaction such as where to meet and whether or not SOI's prospective buyer was ready to go, etc. At that time, your affiant observed YANKA was in close proximity to ORTIZ and within earshot of the conversation but could not be heard speaking in the background.

o. Surveillance agents continued to follow the vehicle and a traffic stop was eventually conducted during the early evening. A search of the vehicle (under the Carroll Doctrine, see infra) yielded approximately two (2) pounds of methamphetamine concealed inside sealed bags of chips. This traffic stop and subsequent search was based upon probable cause to believe there were 2 pounds of

11

methamphetamine in the vehicle (based upon communications between the SOI, TARGET, GHOST and directly with ORTIZ).

p.     The driver of the Corolla was determined to be Veronica YANKA. A criminal history query revealed she was convicted in 2010 for misdemeanor petty theft. The passenger was determined to be Tony ORTIZ. A criminal history query revealed on 01-31-2018, ORTIZ was convicted of: (1) felony Manufacture/ETC Controlled Substance in violation of California Health and Safety Code (H&S) §11379.6(A); and (2) felony Causing Fire of Inhabited Structure/Prop in violation of California Penal Code §452(B). ORTIZ was sentenced to 365 days jail and 5 years probation.

q.     Both ORTIZ and YANKA were asked to exit the vehicle and a cursory pat-down for weapons under the Terry exception was conducted for officer's safety. Each individual was separated, seated on the ground and interviewed in regard to the purpose of their travel.

r.     Your affiant briefly interviewed YANKA who explained the pair traveled to Montana from the San Francisco, CA area for the purpose of visiting family members of her boyfriend (ORTIZ). YANKA stated there were no drugs or contraband inside the vehicle.

s.     Your affiant also interviewed ORTIZ who explained he was currently on probation out of California following a felony conviction for possession of a firearm. ORTIZ denied there were any firearms in the vehicle and gave consent to search the vehicle. ORTIZ was asked where they were coming from (origin). In response, ORTIZ said they left San Francisco, CA and drove 16 hours non-stop to Missoula. ORTIZ clarified YANKA did all the driving since his driver's license was suspended due to "tickets." When asked his address, ORTIZ said 64 Daly Street in San Francisco (YANKA admitted a short time later that ORTIZ lived with her at 260 San Marco Ave, Apt 45, San Bruno, CA). ORTIZ further stated he lived in Sacramento up until a "few" months ago when he moved to San Francisco. ORTIZ said the purpose of their visit to Montana was to visit his sister and brother-in-law who lived in Lolo. ORTIZ said he did not know their address but it was stored in his cell phone which was getting poor service in Montana. ORTIZ said the number to his cell phone was 916-891-8379 (EXHIBIT N-2).

t.     At approximately 10:00 p.m., a search of the vehicle was initiated based upon probable cause to believe methamphetamine was

in the vehicle and the automobile exception to the search warrant requirement pursuant to the Carroll Doctrine. This search yielded approximately 2 pounds (1037.1 gross grams) of substance which field tested positive for methamphetamine (lab results pending). The methamphetamine was concealed inside sealed chip bags located on the rear floorboard and trunk area. A small baggie of marijuana was also seized from the glove box. EXHIBIT N-2 was seized from the center console of the vehicle. EXHIBIT N-3 was seized from the pocket in the driver's door. EXHIBIT N-4 and EXHIBIT N-5 were both seized from inside a black bag on the rear seat.

u.      Both ORTIZ and YANKA were read their post-arrest rights. ORTIZ admitted all the drugs belonged to him and YANKA had nothing to do with transporting the methamphetamine. ORTIZ further admitted the previous explanation of visiting his sister and brother-in-law was a lie and fabricated. ORTIZ thereafter refused to answer any further questions in regard to his ultimate destination, origin, other trips, compensation or who sent him on the trip. YANKA repeated the purpose of their trip was to visit family in Montana. YANKA said her cell phone number was 415-299-9660 (EXHIBIT N-3) and claimed

14

ownership of EXHIBIT N-3 as her personal cell phone and further identified EXHIBIT(s) N-4 and N-5 as her "work" phones. YANKA also said EXHIBIT N-2 belonged to ORTIZ.

v.     Both ORTIZ and YANKA were detained at the Missoula County Detention Facility.

w.     On July 17, 2019, YANKA was released pending further investigation.     ORTIZ was arrested on a Federal Complaint and remanded to the custody of the United States Marshall Service.

# EVIDENCE OF CRIMES LIKELY TO BE FOUND ON SUBJECT ELECTRONIC DEVICES

x.     As a result of my law enforcement training and experience in drug trafficking and money laundering investigations, I have developed a detailed understanding of conspiracies and related illegal activities by criminal drug trafficking organizations and their associates.     Such understanding is detailed in the following paragraphs.

y.     Drug trafficking conspiracies and the distribution of controlled substances are frequently continuing criminal enterprises which span over months, and often, years.  Drug traffickers who have

access to multi-pound quantities of controlled substances typically will obtain and distribute controlled substances on a regular basis.

z.      Based on my training and experience drug traffickers commonly maintain those items described in ATTACHMENT B, including records relating to distribution of controlled substances.

aa.     Based on my training and experience executing search warrants, drug traffickers distribute multiple types of controlled substances including, but not limited to, marijuana, cocaine, methamphetamine, heroin, and prescription pills.  During the execution of search warrants your Affiant has located numerous types of controlled substances at the same search warrant location.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

bb.     As used herein, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: Central Processing Units (CPU's or "computers"); laptop or notebook computers; personal digital assistants; USB hard drives or "jump drives" intended for removable media; digital camera or removable media storage cards; external hard disk drives,

cellular telephones, GPS devices, compact disks (CD, DVD, and Blu-Ray); and security devices.

cc.     Based on my knowledge, training, and experience, as well as information related to me by Agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of the premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

> a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in

desktop computers. Consequently, each non-networked, desktop computer found during a search could contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full-length movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files,

may reside in free space or slack space, i.e., space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires

specialized tools and a controlled laboratory environment.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such

as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

g. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

23

dd. In searching for digital devices and in searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

i. Law enforcement personnel or other individuals assisting law enforcement personnel will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The team searching the digital device(s) shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of this warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 120 day period from the date of execution of the warrant.

ii. The team searching the digital devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

(a) The team may subject all of the data contained in the digital device or the forensic copy capable of

containing items to be seized as specified in this warrant to the protocols to determine whether the digital device and any data falls within the items to be seized as set forth herein.  The team searching the digital device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized as set forth herein.

(b)    These search protocols also may include the use of tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    When searching a digital device pursuant to the specific search protocols selected, the team searching the digital device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

iv.    If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or

other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of Court, and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

v.     At the conclusion of the search of the digital devices as set forth in subparagraph (i) above, any digital device determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the government until further order of court or one year after the conclusion of the criminal case/investigation.    In contrast, if the digital device is not determined to be an instrumentality of the offense(s), a good-faith effort will be made to return the digital device to its rightful owner.

vi.    Notwithstanding the above, after the completion of the search of the digital devices as set forth in subparagraph (i) above, the government shall not access digital data falling outside the

scope of the items to be seized in this warrant on any retained digital devices or digital data absent further order of court.

vii.    If the search team determines that a digital device is not an instrumentality of any offense under investigation and does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will as soon as practicable return the digital device and delete or destroy all the forensic copies thereof.

viii.   If the search determines that the digital device or the forensic copy is not an instrumentality of the offense but does contain data falling within the list of the items to be seized pursuant to this warrant, the government either (i) within the time period authorized by the Court for completing the search, return to the Court for an order authorizing retention of the digital device and forensic copy; or (ii) retain only a copy of the data found to fall within the list of the items to be seized pursuant to this warrant and return the digital device and delete or destroy all the forensic copies thereof.

## CONCLUSION

27

Based on the facts stated in this affidavit, your affiant believes Tony ORTIZ, Veronica YANKA and other co-conspirators are utilizing the SUBJECT ELECTRONIC DEVICES to further their transportation/distribution of controlled substances. This belief is based on TARGET asking the SOI to call the cellular phone numbers associated with EXHIBIT N-2 and EXHIBIT N-3 in order to contact the driver(s) of the load vehicle in order to coordinate where/when to meet and consummate the proposed drug transaction. The load vehicle was eventually stopped and searched which yielded over 500 grams of suspected methamphetamine.

Based on my training and experience, I believe a forensic digital examination of the SUBJECT ELECTRONIC DEVICES will produce evidence of additional criminal activity as well as identification of additional co-conspirators. I also believe these additional co-conspirators will frequently attempt to continue their illicit business even after it is disrupted by law enforcement such as the arrest of a courier (ORTIZ) due to the considerable amount of money made from the sale and/or transportation of illicit substances.

Based on the foregoing, I submit there is probable cause to believe that evidence, fruits, and instrumentalities of (a) conspiracy to possess with intent to distribute methamphetamine, possession with intent to distribute over 500 grams of methamphetamine, in violation of 21 U.S.C §§ 846 and 841(a)(1) as those items are set forth in ATTACHMENT B, will be located at the SUBJECT ELECTRONIC DEVICES, as described on ATTACHMENT A-1, A-2, A-3 and A-4.

Respectfully submitted,

Kevin Evans
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me on the _____/_____ day of

_____, 2019.

Jeremiah Lynch
UNITED STATES MAGISTRATE JUDGE